STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE SUPERIOR COURT
CUMBERLAND CLERK'S CIVIL ACTION
SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-407

Mar 23   4 30 PM '01   REC-CUM-3/23/2001

COASTAL CEMENT CORPORATION,

Plaintiff

v.

AMERICAN COMMERCIAL LINES LLC,

Defendant

ORDER ON DEFENDANT'S
MOTION TO DISMISS

## FACTUAL BACKGROUND

Plaintiff Coastal Cement Corporation ("Coastal") is a Massachusetts corporation with offices in Portland, Maine. Defendant American Commercial Lines ("ACL") is a Delaware limited liability company with offices in Harahan, Louisiana. It is the successor by merger on December 23, 1998 to American Commercial Service LLC, which is the successor by merger on June 29, 1998 to American Commercial Marine Service Company d/b/a Louisiana Dock Company ("LDC"). Neither ACL nor LDC is registered to do business in Maine, has offices in Maine or solicits business in Maine.

On February 28, 1994, LDC and Coastal entered into a Marine Construction Contract in which LDC agreed to repair, refurbish and modify a barge owned and operated by Coastal. The reason for the barge work was to enable Coastal to use the barge to haul cement products manufactured by Dragon Products Co., Inc., a Maine corporation, from Maine to Massachusetts. The work was to be performed at LDC's drydock facility in Harahan, Louisiana. The contract negotiations were conducted primarily at LDC's offices in Louisiana between William Kinzeler, the shipyard

manager for LDC, Greg Hartley of Hartley Marine, Inc., the on-site representative of Coastal, and Hector D'Lima of Coastal. Further negotiations were conducted during 6 to 12 telephone calls between Kinzeler in Louisiana and D'Lima in Maine. The parties negotiated contract drafts, which were prepared by Coastal's counsel and sent from Coastal's Maine office to ACL. ACL then made revisions and submitted them to Coastal's Maine office. Purchase orders and change orders were issued by Coastal from its Portland offices, and all invoices were sent to Coastal at its Portland offices. Coastal remitted payment to ACL from its Maine office. ACL submitted bids for over a million dollars of additional work on the barge to Coastal's Maine office.

Once the work under the contract was completed, the vessel was delivered to Coastal in Louisiana. Hartley then made arrangements for its transport by tug to Boston. William Kinzeler of LDC traveled to Boston when the barge discharged her first load and, during that trip, traveled to Portland and met with Coastal representatives to resolve issues regarding equipment that was installed on the barge.

Under the contract, ACL agreed to pay "sales, consumer, use and similar taxes" for any part of the work that ACL performed on the barge for Coastal. The Maine Revenue Service issued an assessment of use tax, interest and penalties against Coastal by notice dated June 24, 1997. Coastal's counsel notified ACL by letter dated July 28, 1998 of its obligation to pay the use tax under the contract. ACL failed to pay any sales or use tax to the State of Maine for the work it performed on the barge.

2

The Maine Revenue Services ultimately reduced ACL's pro rata share of its alleged use tax and interest liability by 77% and abated all penalties after Coastal filed a request for reconsideration of the assessment. The remaining tax allegedly owed by ACL was eliminated by virtue of legislation passed by the Maine Legislature. Coastal alleges that it ultimately incurred costs of $42,892.77 in legal and accounting fees to challenge the tax assessment and its complaint dated June 28, 2000 is seeking a judgment in this amount.

## DISCUSSION

The jurisdictional reach of Maine's long-arm statute, 14 M.R.S.A. § 704-A (1980 & Supp. 2000)[1], is coextensive with the due process clause of the United States Constitution, U.S. CONST. amend. XIV, § 1. In Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995), the Law Court stated

---

[1] Maine's long-arm statute provides in pertinent part

    **1. Declaration of purpose.** It is declared, as a matter of legislative determination, that the public interest demands that the State provide its citizens with an effective means of redress against nonresident persons who, through certain significant minimal contacts with this State, incur obligations to citizens entitled to the state's protection ....

    This section, to insure maximum protection to citizens of this State, shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.

    **2. Causes of Action.** Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

    A. The transaction of any business within this State;

    ....

    F. Contracting to supply services or things within this State;

    ....

    I. Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.

> In order for Maine to exercise personal jurisdiction over a nonresident defendant, due process requires that (1) Maine have a legitimate interest in the subject matter of this litigation; (2) the defendant, by [its] conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice.

The plaintiff must establish that jurisdiction is proper by satisfying the first two prongs of the test. Dorf v. Complastik Corp., 1999 ME 133, ¶ 11, 735 A.2d 984, 988. If the plaintiff successfully bears this burden, the defendant must then establish that the exercise of jurisdiction does not comport with traditional notions of fair play and substantial justice. Id. Where the hearing is nontestimonial and the court proceeds only upon the pleadings and affidavits, "the plaintiff 'need only make a prima facie showing that jurisdiction exists,' and the plaintiff's written allegations of jurisdictional facts should be construed in its favor." Id. ¶ 14, 735 A.2d at 988-89 (quoting Suttie v. Sloan Sales, Inc., 1998 ME 121, ¶ 5, 711 A.2d 1285, 1286).

## I. The State of Maine's Interest in the Litigation

To establish the first prong that Maine has a legitimate interest in the subject matter of the litigation, a plaintiff must show more than an interest in providing Maine citizens with a means of redress against nonresidents. Murphy, 667 A.2d at 594 ("[A]n interest beyond mere citizenry is necessary, such as the protection of its industries, the safety of its workers, or the location of witnesses and creditors within its border."). Coastal must establish a nexus between this state and the formation, performance or breach of the contract that would give Maine a legitimate interest in

4

litigation arising out of the alleged breach. See Telford Aviation, Inc. v. Raycom National, Inc., 122 F. Supp. 2d 44, 46 (D. Me. 2000).[2] In addition to an interest in providing a resident corporation a means of redress, Coastal has argued that Maine has an interest in collecting use tax from the party responsible for paying it and settling disputes relative to payment of that tax.

## II. Reasonable Anticipation of Litigation

For a foreign corporation to be subject to Maine's jurisdiction, "due process demands that the corporation have sufficient contacts with that State to 'make it reasonable ... to require the corporation to defend the particular suit which is brought there.' " Harriman v. Demoulas Supermarkets, Inc., 518 A.2d 1035, 1037 (Me. 1986) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)). This second prong requires that a defendant's contacts with Maine be more than merely "random," "fortuitous," or "attenuated." Electronic Media Int'l v. Pioneer Communications of Am., Inc., 586 A.2d 1256, 1259 (Me. 1991). A defendant's contacts may not "result solely from the 'unilateral activity of another party.' " Harriman, 518 A.2d at 1037 (quoting Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 417 (1983)). Instead, a defendant must invoke the benefits and protections of Maine laws, thereby purposefully availing itself of the privilege of conducting

---

[2] Labelling this factor "relatedness," the First Circuit asks "whether the defendant's forum-based activities are instrumental in the formation of the contract." Telford Aviation, Inc. v. Raycom National, Inc., 122 F.Supp.2d 44, 46 (D. Me. 2000). As the United States District Court, District of Maine notes, however, the difference between the test established by the Law Court and the test established by the First Circuit is purely semantic. Id. at n.3.

5

activities within this state. See Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189, 1192 (Me. 1993). A plaintiff may satisfy this requirement by showing either that the defendant deliberately engaged in significant activities in Maine or that the defendant created continuing obligations between itself and Maine residents. Id.

A contract with a foreign corporation, standing along, does not automatically establish sufficient minimum contacts. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985); Electronic Media, 586 A.2d at 1259.

> [A] "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors--prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing--that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King, 471 U.S. at 479 (citations omitted) (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316 (1943)). In Burger King, the Supreme Court concluded that the Florida courts had jurisdiction over an out-of-state franchisee even though he did not maintain offices in the state and had never been physically present in the state because the franchisee entered into a contract that had a substantial connection to Florida. Id. at 479. The Court noted that the franchisee reached out beyond his state and negotiated with the Florida corporation for the purchase of a long-term franchise and entered into a carefully structured relationship that envisioned continuing and wide-reaching contracts with the Florida corporation. Id. The Court held that in light of the franchisee's "voluntary acceptance of the long-term and

6

exacting regulation of his business from Burger King's Miami headquarters," the quality and nature of his relationship to the Florida corporation could not be viewed as "random," "fortuitous," or "attenuated." Id.

In Electronic Media, 586 A.2d at 1259-60, the Law Court applied this "contract-plus" analysis to determine whether the plaintiff had carried its burden on the second prong of the due process test. In that case, the plaintiff alleged that the defendant entered into a $3,000 contract with the plaintiff, engaged in discussions and negotiations with the plaintiff over a period of five months, sold and delivered products to the plaintiff, made assurances to the plaintiff that the defendant would perform under the contract, and knew or should have known that the plaintiff was relying to its detriment upon the defendant's price quotations. Id. at 1260. The Law Court concluded that those allegations compelled the conclusion that the defendant reasonably should have anticipated litigation in Maine. Id.

Similar to Burger King and Electronic Media, ACL "reached out" beyond Louisiana and negotiated the contract with Coastal for the renovation of Coastal's barge. Many of the contacts were initiated by Coastal and are therefore not relevant to the jurisdictional issue before the Court. See Murphy, 667 A.2d at 594 ("Contacts that result solely from the unilateral activity of another party do not satisfy the minimum contacts requirement."). Sufficient contacts initiated by ACL exist, however, to establish that it purposefully directed its activities at Maine. Although the terms of the contract were negotiated primarily at the LDC offices in Harahan, Louisiana, William Kinzeler and Hector D'Lima negotiated by phone between 6 and

12 occasions. ACL proposed changes on the contract draft and submitted it to Coastal at its Maine office. Even after the contract was signed, ACL submitted bids for over a million dollars of additional work on the barge as well as invoices directing Coastal to remit payment to ACL in North Carolina. After delivery of the barge to Coastal, Mr. Kinzeler travelled to Maine to resolve issues regarding some material handling equipment that was installed on the barge.

The contract also supports Maine's exercise of personal jurisdiction. It provides that the "Contractor shall pay sales, consumer, use and similar taxes for the Work or portions thereof provided by Contractor." Contract Art. 9, § 9.5. Noting that the contract does not mention Maine, ACL argues that it assumed that because no taxes would be assessed under Louisiana law that the situation would be the same in other jurisdictions. The existence of that "no tax" assumption does not explain the presence of the tax clause in the contract. Rather, the existence of the contract clause at issue suggests that ACL reasonably should have and did anticipate tax liability somewhere outside of Louisiana. In these circumstances, the assertion of tax liability and the legal and accounting related activities in Maine were not random, fortuitous or attenuated.

Relying on Architectural Woodcraft Co. v. Read, 464 A.2d 210 (Me. 1983), ACL argues that this case should be dismissed because it amounts to nothing more than a single contract with a resident plaintiff and the use of interstate communications to negotiate the contract. In Architectural Woodcraft, the plaintiff, a manufacturer of spiral staircases, and the defendant, a resident of California, entered into a contract

8

for the construction of a staircase. Id. at 211. The defendant paid a deposit by check, the plaintiff shipped the staircase to California and the defendant then paid the balance due by check. Id. When the defendant discovered the staircase had sustained damage in transit, he stopped payment on his check but retained the staircase. Id. The plaintiff subsequently brought suit in Maine seeking damages for breach of contract and conversion. Id. The defendant never set foot in Maine or conducted any other business here. Id. at 212. The Law Court held that the existence of a single contract with a resident plaintiff coupled with the use of interstate communications was insufficient to establish a basis for asserting jurisdiction over a defendant. Id. at 213. The facts in this case are distinguishable from Architectural Woodcraft because they do not involve a single contract for an isolated sale between a Maine resident and an out-of-state defendant who had no other contact with Maine.

## III. Traditional Notions of Fair Play and Substantial Justice

The third prong involves a determination of fairness and requires this Court to consider various factors, including "the nature and purpose of [the] defendant's contacts with the forum state, the connection between the contacts and the cause of action, the number of contacts, the interest of the forum state in the controversy, and the convenience and fairness to both parties." Harriman, 518 A.2d at 1038. The nature, purpose, and number of contacts and the interest of the State of Maine in the litigation all support jurisdiction. The connection between ACL's contacts and Coastal's cause of action also supports this Court's exercise of jurisdiction. A

nonresident corporation may be subject to jurisdiction in this state on a cause of action unrelated to its activities in the state if such activities are wide-ranging, continuous and systematic. Id. Because this cause of action arises in connection with ACL's Maine-based activities, however, less extensive activity is required. See Electronic Media, 586 A.2d at 1260.

ACL has failed to establish that considerations of the fairness and convenience to both parties render jurisdiction unreasonable. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477; see also Harriman, 518 A.2d at 1039 (requiring the defendant to establish that jurisdiction was unreasonable and inconvenient). A defendant must show that "litigation in Maine would be so gravely difficult and inconvenient that it would be at a severe disadvantage as compared to [the plaintiff]." Electronic Media, 586 A.2d at 1260.

ACL has failed to establish that it would be significantly inconvenienced by being required to appear and defend in Maine. ACL has not, by affidavit or otherwise, suggested that it will suffer severe hardship by appearing in Maine. Instead, it asserts that the hardship a party incurs when forced to litigate in a foreign jurisdiction is implicit. This is insufficient to establish that requiring ACL to appear and defend is unreasonable.

The entry is

10

Defendant's motion to dismiss is DENIED.

Dated at Portland, Maine this 23rd day of March, 2001.

Robert E. Crowley
Justice, Superior Court

11

Date Filed __06-29-00__    __CUMBERLAND__    Docket No. __CV 00-407__

County

Action __CONTRACT__

COASTAL CEMENT CORPORATION      AMERICAN COMMERCIAL LINES LLC   -defaulted

vs.

| Plaintiff's Attorney   ANN ST PETER-GRIFFITH ESQ | Defendant's Attorney |
|---|---|
| JOTHAM D. PIERCE JR. ESQ   791-1100 | ROBERT HAYES & JONATHAN KAPP, ESQS. |
| ONE MONUMENT SQUARE ME 04101 | P. O. BOX 7250, PORTLAND, ME. 04112-7 |
| | 775-6001 |

| Date of Entry | |
|---|---|
| 2000 June 30 | Received 06-29-00:<br>Complaint Summary Sheet filed.<br>Complaint with Exhibit A and B filed. |
| "   " | |
| Aug. 15 | Received 08-14-00:<br>Summons filed showing officer's return of service on July 14, 2000 upon<br>American Commercial Lines LLC to Joanne Mayni, Corporate Secretary of<br>the Corporation Trust Company, Registered Agent for American Commercial<br>Lines, LLC. |
| "   " | Acknowledgment fill showing Affidavit of Service on July 14, 2000 upon<br>Joanne Mayni, Corporate Secretary. |
| Aug. 15 | Received 08-14-00:<br>Plaintiff's Application to Clerk's for Default and Default Judgment agains<br>American Commercial Lines, LLC filed.<br>On 08-15-00 default enter against American Commercial Lines, LLC.<br>Copy of default mailed to Jothan D. Pierce Jr. Esq. and American Commercia<br>Lines LLC at 1701 East Market Street, Jeffersonville, IN 47130-4717. |
| Aug.   15 | Received 08/15/00:<br>Defendant's Motion for Enlargement of Time to Respond to the Plaintiff's<br>Complaint filed. |
| Aug. 17 | Received 08-17-00:<br>Letter from Jonathan E. Kapp, Esq. stating plaintiff's counsel should not<br>be rewarded with a default that would relieve it of its obligation to pro<br>its case on the merits filed. |
| Aug. 17 | Received 08-17-00:<br>Letter from Jonathan A. Block Esq. responding to a letter addresse   to<br>Aline Dupont dated August 16, 2000 filed. |
| Sep. 1 | Received 09-01-00:<br>Order Granting Defendant's Motion for Enlargement Time to Response to the |